**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**SUNNYLAND REFINING COMPANY, a Wholly Owned Subsidiary of Kane-Miller Corporation, Respondent.**

No. 72–2919
Summary Calendar.*

United States Court of Appeals,
Fifth Circuit.

March 1, 1973.

---

\* Rule 18, 5 Cir., Isbell Enterprises, Inc. v. Citizens Casualty Company of New York et al., 5 Cir., 1970, 431 F.2d 409, Part I.

Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., Washington, D. C., Walter C. Phillips, Director, Region 10, N. L. R. B., Atlanta, Ga., for petitioner.

Joseph P. Carey, Industrial Relations, Kane-Miller Corp., New York City, for respondent.

Before WISDOM, GODBOLD and RONEY, Circuit Judges.

WISDOM, Circuit Judge:

The NLRB seeks enforcement of its order that the respondent, Sunnyland Refining Co., cease and desist from violating sections 8(a)(5) and 8(a)(1) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(5) and by refusing to bargain with the certified representative of its employees. The company's sole contention is that the board incorrectly determined the appropriate unit. The case turns on the correctness of the Board's excluding certain dual function employees from the unit. See Berea Publishing Co., 1963, 140 N.L.R.B. 516. We grant enforcement.

I.

Sunnyland Refining Co., a wholly owned subsidiary of Kane-Miller Corp., maintains a plant at Birmingham, Alabama, where it is engaged in the manufacture, sale, and distribution of oleomargarine and related products. On October 20, 1971, the Teamster Local Union 612 filed a representation petition with the board requesting certification as the bargaining representative of a unit consisting of the company's truckdrivers, mechanics, and tiremen employed at the Birmingham plant. The proposed unit included 34 shipper-drivers, a truck mechanic, his helper, and a tireman, all of whom work in the plant's transportation department. The record indicates that the shipper-drivers spend an average of four days and nights per week on the

road and make almost exclusively interstate deliveries. All shipper-drivers are ICC qualified and carry ICC log books. When they are not driving, most perform plant work incidental to their driving duties, such as loading and unloading trucks and labeling margarine. In general, however, the shipper-drivers have almost no time available for plant work. All are paid on a weekly salary basis.

The company contended that the unit should include 20 plant employees who both drive trucks and perform production and maintenance work unrelated to their driving duties. These "dual function" plant employees deliver about 15% of the company's product, compared with the 60% delivered by the shipper-drivers and the 15% picked up by customers. Most of their deliveries are intrastate, and each dual function plant employee spends almost one day a week driving. The remaining time is spent in production and maintenance work. All dual function plant employees work a 40 hour week from 7:00 a. m. to 4:00 p. m. Fourteen of the dual function plant employees who drive are paid on an hourly basis; six are on salary. Only one of the dual function employees is on the same pay scale as the shipper-drivers.

On December 14, 1971, the board's acting regional director, after a hearing, approved the union's proposed unit. The director found that the shipper-drivers operate primarily interstate, while the dual function plant employees operate almost exclusively intrastate. Furthermore, the shipper-drivers spend almost all of their time away from the plant, while the dual function plant employees work primarily in the plant. The shipper-drivers and the dual function employees have separate supervision, are paid differently, and use different lounge facilities. The director concluded that the unit should consist of: "All shipper drivers at the Company's Birmingham, Alabama plant including the mechanic, the mechanic's helper and the tireman, but excluding all other employees. . . ." The board later upheld the director's decision and ordered an election among the members of the unit. On January 10, 1972, an election was held in which a majority of the employees voted in favor of the union, and on January 18, the board certified the union as the collective bargaining agent for the unit. The company refused to bargain with the union.

## II.

The company contends that the board departed from its prior decisions by refusing to include the 20 dual function plant employees in the unit because they spend less than 50% of their time performing work similar to the shipper-drivers'. The company points to the acting regional director's statement in issuing his decision: "The fact that the twenty dual-function employees do some driving is insufficient to rebut the presumptive appropriateness of the unit sought by the Petitioner where, as here, they devote less than 50% of their time performing driving duties." The company argues that this holding is inconsistent with Berea Publishing Co., 1963, 140 N.L.R.B. 516, 519, in which the board stated: "[W]e now believe that a dual function employee devoting less than fifty-one percent of his time to unit work may have sufficient interest to be included in the unit."

We perceive no inconsistency between *Berea* and the present case. The company reads *Berea* as requiring inclusion of dual function employees who devote less than 50% of their time to unit work. The board, however, held only that dual function employees cannot be excluded solely on the ground that they do not work with the unit more than 50% of the time. It did not hold that such employees must always be included in the unit. In each case, the question is whether the employees have a sufficient interest in the unit's conditions of employment to be included in the unit. Berea Publishing Co., *supra*.

In making this determination, the board must consider a number of factors, including (1) differences in

methods of compensation, (2) different hours of work, (3) different employment benefits, (4) separate supervision, (5) degree of dissimilar qualifications, training and skills, (6) differences in job functions, (7) amount of working time spent away from the plant, (8) infrequency or lack of contact with other employees, (9) lack of integration with the work functions of other employees or interchange with them, and (10) the history of bargaining. Kalamazoo Paper Box Corp., 1962, 136 N.L.R.B. 134; E. H. Koester Bakery Co., 1962, 136 N.L.R.B. 1006; Ore-Ida Foods, Inc., 1964, 146 N.L.R.B. 464. In the present case, the board had to consider how similar the driving done by the plant employees is to the driving done by the shipper-drivers and how much driving the plant employees do.

■ There was ample indication that, weighing all pertinent factors, the dual function plant employees should have been excluded from the proposed unit. The intrastate driving duties occasionally performed by these employees was the only significant factor favoring their inclusion. In determining whether this alone was sufficient to overcome the other substantial differences and establish a true community of interest with the shipper-drivers, the regional director properly noted that the driving duties of the dual function plant employees were minimal and constituted only a small percentage of their working week. In these circumstances, inclusion in the unit was not warranted. *See* Giordano Lumber Co., Inc., 1961, 133 N.L.R.B. 205; Ballentine Packing Co., 1961, 132 N.L.R.B. 923; St. John's Associates, 166 N.L.R.B. 287 enforced, 2 Cir. 1968, 392 F.2d 182.

■ *Berea* may also be distinguished on another basis. In *Berea*, the question confronting the board was whether particular employees were properly excluded from the unit. The board's decision re-established the policy that dual function and part-time employees should be treated alike in terms of voting eligibility. In the present case, however, we are confronted with the question whether two separate bargaining units are appropriate. In such circumstances, the proper scope of inquiry is the aggregate similarities or dissimilarities between the conditions of employment of the two groups of employees. The percentage of working time that the dual function plant employees devote to driving duties is relevant to that question.

We conclude that the board's order is supported by substantial evidence and that the dual function plant employees were properly excluded from the unit. The order of the board must be enforced.

Enforced.